Emily Abraham (CA SBN 285019)
emily@abrahamgautam.com
Gautam Jagannath (CA SBN 285020)
gautam@abrahamgautam.com
**ABRAHAM & GAUTAM, LLP**
*Civil Rights Boutique*
1400 Shattuck Avenue, Ste 12-160
Berkeley, CA 94709
(p) 510.982.1190 (office)
(f) 510.761.7721(fax)

*Attorneys for Siran ZHANG*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| Siran ZHANG, an adult individual | Case No. **25-cv-4843** |
| Plaintiff, | **COMPLAINT FOR DAMAGES** |
| v. | |
| APPLE INC., a Delaware corporation, | **JURY TRIAL DEMANDED** |
| Defendant. | |

ABRAHAM & GAUTAM, LLP | CIVIL RIGHTS BOUTIQUE

**ABRAHAM & GAUTAM, LLP | CIVIL RIGHTS BOUTIQUE**

## **INTRODUCTION**

1. This case concerns Apple's discriminatory dismissal of a loyal employee who spent almost a decade delivering exemplary performance.

2. Siran ("Chelsea") Zhang is a Chinese national who worked her way up from Apple's Asia Pacific Office ("APO") to its prestigious Cupertino headquarters.

3. She was fired not for any legitimate business reason, but because of ugly stereotypes about Chinese employees and a biased investigation designed to force her out after she had concerns about Apple internal workings.

4. In March 2024, Ms. Zhang met with Sid Babbar for the first time, Apple's head of procurement, to discuss concerns about a project. This routine business meeting—their first one-on-one interaction—somehow transformed into baseless accusations that Ms. Zhang possessed knowledge of supply chain bribery and kickbacks. Despite the absence of any evidence, Apple launched a six-month investigation of Ms. Zhang marked by racial bias, privacy violations, and manufactured accusations.

5. The investigation was tainted from the start. Lead investigator Cyndi Kavanagh revealed her prejudice in the very first interview, telling Ms. Zhang something to the effect of: "You know APO, they always do such things, you must know something." This statement—suggesting that Chinese employees from Apple's Asia Pacific Office ("APO") are inherently corrupt—set the tone for everything that followed. Rather than seeking truth, the investigators sought to confirm their discriminatory assumptions.

6. When Ms. Zhang complained about this bias and the investigation's procedural violations, matters only worsened. Investigators illegally accessed her private WeChat messages with family and friends on her Apple device, seized her devices through coercion, and twisted innocent personal conversations into evidence of professional

misconduct. They accused her of "dishonesty" based on demonstrably false claims and labeled her "uncooperative" for declining to answer questions they admitted were irrelevant to the investigation.

7. On October 16, 2024, Apple terminated Ms. Zhang's employment, citing vague violations of its Business Conduct Policy. The real reason was clear: Apple fired a Chinese employee based on discriminatory stereotypes, retaliating against her for challenging the biased investigation. This termination violated federal and California law, Apple's own policies, and basic principles of fairness and dignity in the workplace.

8. Ms. Zhang brings this action to vindicate her rights, clear her name, and ensure that others Apple employees facing such discrimination based on their national origin or association with Apple's international offices come out of the shadows and follow suit.

## PARTIES

9. Plaintiff SIRAN ZHANG is a citizen and resident of the People's Republic of China. From January 5, 2015, to October 16, 2024, she was employed by Defendant Apple Inc. as a Manufacturing Quality ICT4 at Apple's facilities in Cupertino, California, which is the equivalent to a Senior Engineer.

10. Ms. Zhang often went by an "Americanized" name, Chelsea, which may appear in many of the documents relevant to this case.  Any references to Chelsea and/or Siran refer to Ms. Zhang equally.

11. Defendant APPLE INC. ("Apple") is a Delaware corporation with its principal place of business at One Apple Park Way in Cupertino, a city located in California.

12. Apple is one of the world's largest technology companies, generally needs no introduction, and employs thousands of individuals in California and worldwide.

## JURISDICTION & VENUE

13. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) because this is a civil action between a citizen of a State and a citizen of a foreign state, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

14. Ms. Zhang is presently a citizen and resident of the People's Republic of China.

15. Ms. Zhang seeks damages well in excess of $75,000. This includes but is not limited to: lost wages and benefits from her ultimate $176,851 annual salary; future lost earnings; compensatory damages for emotional distress, humiliation, and reputational harm; and punitive damages when statutorily appropriate for Apple's malicious, fraudulent, and oppressive conduct leading to her unlawful termination.

16. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Ms. Zhang's claims occurred in this District. Pursuant to Civil L.R. 3-2(e), all civil actions arising in Santa Clara County shall be assigned to the San Jose Division.

17. Specifically, at all relevant times, Ms. Zhang worked at Apple's Cupertino headquarters, all discriminatory conduct occurred in Cupertino, the investigation meetings took place in Cupertino, and the termination decision was made and communicated in Cupertino, California. The vast majority of the acts or omissions contemplated in this action took place in California.

18. This Court has personal jurisdiction over Apple because Apple maintains its principal place of business in this District and the unlawful conduct alleged herein occurred in this District.

19. Ms. Zhang exhausted any and all administrative remedies for claims requiring such exhaustion before either the California Department of Civil Rights and/or the Equal

Employment Opportunity Commission and obtained a right to sue letter on or around June 7, 2025.

## LEGAL FRAMEWORK PROTECTING EMPLOYEES IN CALIFORNIA

20. The Fair Employment and Housing Act (Cal. Gov. Code § 12940 et seq.) provides comprehensive protection against workplace discrimination and retaliation. FEHA must be construed liberally to accomplish its purposes of eliminating discrimination and protecting employees.

21. Under FEHA, retaliation claims receive scrutiny because retaliation strikes at the heart of the statute's enforcement mechanism. California courts apply a broad interpretation of protected activity, covering internal complaints of discrimination even when made informally.

22. FEHA's anti-discrimination provisions prohibit adverse employment actions based on national origin, including actions based on stereotypes or assumptions about employees from particular countries or regions. Comments reflecting bias against a particular national origin group constitute evidence of discriminatory intent, even when not made by the final decision-maker.

23. Harassment based on national origin violates FEHA when it creates an intimidating, hostile, or offensive working environment. A single incident can constitute harassment if sufficiently severe. Comments suggesting that employees of certain national origins are inherently untrustworthy or criminal constitute prohibited harassment.

24. California Labor Code § 1102.5 provides expansive protection for employees who report suspected violations of law to persons with authority over them or to others with authority to investigate. The statute uses a "contributing factor" standard, requiring only that the employee show protected activity was a contributing factor in the adverse action.

ABRAHAM & GAUTAM, LLP | CIVIL RIGHTS BOUTIQUE

25. Once an employee establishes that protected activity was a contributing factor, the burden shifts to the employer to prove by clear and convincing evidence that it would have taken the same action for legitimate, independent reasons.

26. Protected disclosures include reports made internally to supervisors about suspected illegal activity, including violations of anti-discrimination laws. The employee need only have a reasonable belief that a violation occurred.

27. The California Constitution explicitly guarantees the right to privacy as an inalienable right. This constitutional protection extends to private sector employees and covers informational privacy, including personal communications and data.

28. Employers must demonstrate a compelling interest and show that any privacy intrusion is narrowly tailored to achieve legitimate objectives. Accessing employee personal communications without consent or legitimate business justification violates this constitutional right.

29. California recognizes common law invasion of privacy torts, including intrusion upon seclusion, which occurs when one intentionally intrudes into private matters in a way highly offensive to a reasonable person. Personal messages with family and friends fall within protected zones of privacy under California law.

30. California recognizes a common law tort for wrongful termination in violation of public policy when an employee is terminated for refusing to violate a statute, performing a statutory obligation, exercising a statutory right, or reporting a statutory violation.

31. FEHA's prohibitions against discrimination and retaliation constitute fundamental public policies sufficient to support a wrongful termination claim. Terminating an employee based on discriminatory stereotypes or in retaliation for reporting discrimination violates these fundamental policies.

ABRAHAM & GAUTAM, LLP | CIVIL RIGHTS BOUTIQUE

32. Every employment agreement in California contains an implied covenant of good faith and fair dealing. When an employer conducts a sham investigation designed to manufacture grounds for termination, particularly after an employee engages in protected activity, it breaches this covenant.

33. False accusations of dishonesty or unethical conduct in the workplace constitute defamation *per se* under the California Civil Code as they directly affect professional reputation. The qualified privilege for employment communications is lost when statements are made with malice. Publication need not even exceed the bounds of the human resources file.

34. Intentional infliction of emotional distress in California requires extreme and outrageous conduct exceeding all bounds of decency tolerated in civilized society. In the employment context, conduct that singles out an employee based on protected characteristics, combined with other wrongful acts, can constitute extreme and outrageous behavior.  The claim does not require the presence of an individually named defendant to properly lie.

35. FEHA permits recovery of all damages proximately caused by discrimination and retaliation, including back pay, front pay, emotional distress damages, and loss of professional reputation. Unlike its federal corollary, FEHA has no caps on compensatory or punitive damages.

36. California Civil Code § 3294 allows punitive damages where the defendant has been guilty of oppression, fraud, or malice. Discrimination based on protected characteristics combined with conscious disregard of employee rights can support punitive damages. Managing agents' discriminatory conduct can be imputed to the employer for punitive damages purposes.

ABRAHAM & GAUTAM, LLP | CIVIL RIGHTS BOUTIQUE

37. FEHA provides for attorney's fees to prevailing plaintiffs. California follows the federal lodestar method, allowing enhancement for exceptional results or particularly complex litigation.

38. For those provisions of California common law, the Court looks to the California Civil Jury Instructions ("CACI") created and approved by the Judicial Council of California.

## **STATEMENT OF FACTS**

Ms. Zhang's Exemplary Career at Apple

39. Ms. Zhang began her career with Apple on January 5, 2015, joining the company's Asia Pacific Office (APO) in China. Over nearly a decade, she demonstrated exceptional dedication, technical expertise, and integrity.  She received several promotions before ultimately transferring to the United States to Apple's Cupertino headquarters.

40. In 2021, Ms. Zhang was promoted to Manufacturing Quality Manager at APO, leading a team of seven (7) engineers. This promotion reflected her strong performance and meaningful contributions to previous projects

41. In 2023, after eight successful years at Apple, Ms. Zhang transferred to Apple's prestigious Cupertino headquarters as a Manufacturing Quality ICT4. This transfer represented a significant professional achievement and reflected Apple's recognition of her valuable contributions.

42. This transfer to the United States required Apple to sponsor a specific kind of visa known as the L-1 visa which is only processed for those "seeking to enter the United States to provide service in an executive or managerial capacity for a branch of the same employer or one of its qualifying organizations." 8 C.F.R. § 214.2(l)(1)(ii)(B)-(C).

43. Throughout her nearly ten-year tenure at Apple, Ms. Zhang had never received any disciplinary action, warning, or negative performance feedback. Her personnel file before this investigation contained only positive reviews, commendations, and documentation of her steady career progression. This spotless record makes the pretextual nature of her termination even more apparent on its face.

44. Ms. Zhang consistently received positive performance reviews and recognition for her work. By 2024, she was earning an annual salary of $176,851, reflecting her seniority, high performance and value to the company.

45. Ms. Zhang's work involved quality control and manufacturing processes for Apple's products. She developed extensive expertise in Apple's supply chain operations and built professional relationships across the organization.

The March 2024 Meeting and Start of Baseless Accusations

46. On or about March 15, 2024, Ms. Zhang attended her first one-on-one meeting with Sid Babbar, Apple's manager of one procurement. Ms. Zhang initiated this meeting to discuss concerns about a project Mr. Babbar was leading and to better understand its background.

47. This was a routine business meeting between colleagues who had never previously met one-on-one. The discussion focused on legitimate project-related concerns and lasted approximately one hour.

48. Despite the limited nature of this interaction, Mr. Babbar subsequently filed a complaint against Ms. Zhang, alleging that she might have knowledge of supply chain violations, including bribery and kickbacks.

49. Mr. Babbar provided no evidence to support these serious accusations. He did not claim that Ms. Zhang had admitted to any wrongdoing or that she had provided any specific

ABRAHAM & GAUTAM, LLP | CIVIL RIGHTS BOUTIQUE

information about improper conduct. Nevertheless, Apple treated his baseless allegations as credible enough to launch a major investigation.

A Discriminatory Investigation Begins

50. Following Mr. Babbar's complaint, Apple's Business Conduct ("BC") team initiated an investigation led by investigator Cyndi Kavanagh, with support from Eric Christopher and others inside of Apple.

51. From the very first interview, Ms. Kavanagh demonstrated racial bias against Ms. Zhang. Upon learning about Ms. Zhang's eight-year tenure at APO before transferring to Cupertino, Ms. Kavanagh stated something to the effect of: "You know APO, they always do such things, you must know something."

52. This statement revealed Ms. Kavanagh's discriminatory belief that employees from Apple's China office—particularly Chinese employees—are inherently involved in or knowledgeable about corruption. This bias infected the entire investigation toward Ms. Zhang.

53. Throughout the investigation, the BC team operated from the prejudiced assumption that because Ms. Zhang was Chinese and had worked in China, she therefore must be involved in misconduct. They ignored the obvious implausibility of Mr. Babbar's allegations, particularly given that he and Ms. Zhang had barely known each other before their single meeting.

54. The investigation lasted six months and included four lengthy interviews with Ms. Zhang. Despite this extensive process, investigators found no evidence that Ms. Zhang had any knowledge of or involvement in supply chain violations.

Improper Tactics Ensued

ABRAHAM & GAUTAM, LLP | CIVIL RIGHTS BOUTIQUE

55. Unable to find legitimate evidence of wrongdoing, the BC team resorted to improper and illegal tactics to build a case against Ms. Zhang.

56. Without Ms. Zhang's knowledge or consent, investigators accessed and reviewed her private WeChat messages with family and friends. These personal communications were entirely unrelated to Apple's business and were protected by Ms. Zhang's reasonable expectation of privacy.

57. Ms. Kavanagh's bias extended beyond her verbal comments. Throughout the investigation, the BC team maintained an unsubstantiated negative view toward Apple's Asia Pacific Office. The general attitude within the investigation team was that APO was a place more likely to be involved in misconduct and therefore Ms. Zhang was such a corrupt person.

58. This systemic bias influenced the investigation's direction, with investigators proceeding from the assumption that anyone from APO—particularly Chinese employees—must be complicit in misconduct such as bribery and kickbacks.

59. The investigators seized on casual, private conversations and twisted them into alleged evidence of misconduct.

60. For example, they questioned Ms. Zhang about a joking exchange with a friend where they commiserated about working hard while others might profit improperly—a conversation that actually demonstrated Ms. Zhang's integrity.

61. They interrogated her about casual gossip regarding rumored layoffs, treating water-cooler talk as evidence of insider knowledge.

62. In addition, they scrutinized a conversation with Ms. Zhang's husband about a business trip to Japan, attempting to imply improper supplier relationships where none existed.

63. On May 23, 2024, investigator Cyndi Kavanagh forcibly seized Ms. Zhang's work devices without following proper procedures. When Ms. Zhang questioned the

compliance of this action, Ms. Kavanagh threatened that refusing to comply would result in immediate escalation and potential termination.

64. Ms. Kavanagh then left the meeting early and instructed an IT colleague to complete the device seizure. Despite promising to provide documentation of the interview, she never did so.

Ms. Zhang Complained About Discrimination & Retaliation

65. On May 27, 2024, deeply concerned about the discriminatory treatment and procedural violations, Ms. Zhang met with her People Business Partner (PBP), Katrina Lim, to file a formal complaint.

66. During this meeting, Ms. Zhang specifically reported Ms. Kavanagh's discriminatory statement about APO employees, the biased nature of the investigation, the improper seizure of her devices, as well as her belief that the investigation was motivated by discrimination rather than legitimate concerns.

67. Ms. Zhang documented her concerns in writing, creating a PDF file on June 17, 2024, containing the same information she had shared with Ms. Lim. She later emailed this documentation to Ms. Lim on August 15, 2024, to ensure a clear record existed.

68. Rather than addressing Ms. Zhang's discrimination complaints, Apple allowed the investigation to continue under the same biased investigator. Moreover, the investigation appeared to intensify after Ms. Zhang's complaint, strongly suggesting retaliation for her protected activity.

Escalation of Retaliation & False Accusations

69. Following Ms. Zhang's discrimination complaint, the BC team's tactics became increasingly aggressive and retaliatory.

ABRAHAM & GAUTAM, LLP | CIVIL RIGHTS BOUTIQUE

70. On August 13, 2024, Apple suspended Ms. Zhang with pay, forcing her to stop working while the investigation continued. This suspension, coming nearly five months after the initial complaint and just weeks after her discrimination complaint, appeared designed to punish and isolate her.

71. Ms. Zhang's consistent version of events can be corroborated by multiple witnesses.

72. The sudden suspension without explanation caused confusion among Ms. Zhang's colleagues and led to damaging rumors about her absence. The lack of communication about her status and inability to properly transition her work responsibilities caused significant reputational harm to Ms. Zhang inside the company.

73. When Ms. Zhang sought help from PBP to address these rumors and the damage to her reputation, the BC team used her request as an opportunity to manufacture evidence against her. They called her to a meeting ostensibly to address her concerns, then asked her to name colleagues who had contacted her about her absence.

74. When Ms. Zhang questioned the relevance of this inquiry, the investigator explicitly stated that the question was unrelated to the investigation and that she could choose not to answer.

75. Relying on this representation, Ms. Zhang declined to name her colleagues, not wanting to subject them to what was a discriminatory investigation for simply expressing concern about her.

76. The BC team later used this interaction—where Ms. Zhang followed the investigator's own instructions—as alleged evidence of "non-cooperation" justifying termination.

The Pretextual Termination

77. On October 2, 2024, Apple informed Ms. Zhang that her employment would be terminated effective October 16, 2024. The termination letter, signed by skip-level

Manager Jayang Patel, cited only vague references to violations of Apple's Business Conduct Policy.

78. Through subsequent communications with Mike Gillaspie from People Relations, Ms. Zhang learned that Apple based her termination on two manufactured grounds: dishonesty and non-cooperation.

79. Apple falsely claimed Ms. Zhang had been inconsistent in her statements, specifically alleging she first denied then admitted speaking with Mr. Babbar and claimed then denied knowledge of supply chain violations.

80. These allegations were demonstrably false—Ms. Zhang never denied speaking with Mr. Babbar and consistently maintained she had no knowledge of any wrongdoing.

81. Apple cited the incident where Ms. Zhang declined to name colleagues after being told the question was irrelevant to the investigation and she could choose not to answer.

82. These stated reasons were pretextual. The real reason for Ms. Zhang's termination was discrimination based on her Chinese national origin and her association with APO, compounded by retaliation for complaining about this discrimination.

Apple Violated its Own Policies

83. Throughout this process, Apple violated its own clearly stated policies, including its Business Conduct Policy, Global Whistleblowing Policy and Privacy Policies.

84. Apple's own Business Conduct Policy prohibits discrimination based on national origin and requiring fair, unbiased investigations.

85. Apple's Business Conduct Policy specifically states that the company "does not tolerate discrimination" and promises to "treat customers, partners, suppliers, employees, and others with respect and courtesy." The investigation and termination of Ms. Zhang violated these fundamental principles.

ABRAHAM & GAUTAM, LLP | CIVIL RIGHTS BOUTIQUE

86. Apple's own Global Whistleblowing Policy protects employees who report discrimination and prohibiting retaliation for good-faith complaints.

87. Despite Apple's stated commitment to "protecting and supporting individuals who report potential misconduct," the company retaliated against Ms. Zhang for reporting discrimination, ultimately terminating her employment.

88. Apple's own Privacy Policies protect employee privacy and limiting monitoring to legitimate business purposes.

89. Apple's pattern of concealment and retaliation continued even after Ms. Zhang's termination. On January 22, 2025, Ms. Zhang's counsel sent a formal request for her personnel and payroll records pursuant to California Labor Code §§ 226, 432, and 1198.5. Apple's representative Joe Miguez III confirmed receipt on January 24, 2025.

90. Despite clear California statutory deadlines known to Apple and repeated follow-up communications nearly every month, Apple has refused to produce a single document or response. This deliberate withholding of records is particularly revealing given that these documents would include the investigation files, interview notes, and performance records that would expose the pretextual nature of Ms. Zhang's termination.

91. Apple's repeated refusal to comply with basic statutory obligations to provide employment records strongly suggests consciousness of guilt—an employer confident in the legitimacy of its investigation and termination would have no reason to violate state law to conceal these documents.

92. Apple's stonewalling demonstrates that it knows the requested records would reveal the discriminatory bias, procedural violations, and manufactured nature of the accusations against Ms. Zhang.

## FIRST CAUSE OF ACTION

ABRAHAM & GAUTAM, LLP | CIVIL RIGHTS BOUTIQUE

## RETALIATION IN VIOLATION OF FEHA

### (Cal. Gov. Code § 12940(h))

93. Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

94. As set forth above in the Legal Framework, FEHA prohibits employers from retaliating against employees who oppose practices forbidden under FEHA. Ms. Zhang engaged in protected activity on May 27, 2024, when she complained to People Business Partner Katrina Lim about the discriminatory treatment she experienced during the investigation.

95. Specifically, Ms. Zhang reported that investigator Cyndi Kavanagh had made the discriminatory statement to the effect of "You know APO, they always do such things, you must know something," which revealed bias against Chinese employees and those from Apple's Asia Pacific Office.

96. Ms. Zhang explained that this statement set a discriminatory tone for the entire investigation and that she was being targeted based on stereotypes about her national origin rather than any evidence of wrongdoing.

97. Ms. Zhang's complaint to Ms. Lim constituted protected opposition to national origin discrimination forbidden by FEHA. She had a reasonable and good faith belief that the investigation was being conducted in a discriminatory manner in violation of FEHA and Apple's own anti-discrimination policies.

98. Following Ms. Zhang's protected complaint, Apple engaged in a pattern of retaliatory adverse employment actions. The temporal proximity between her May 27 complaint and the subsequent adverse actions establishes a prima facie case of retaliation.

99. On August 13, 2024, less than three months after her discrimination complaint, Apple suspended Ms. Zhang with pay, forcing her to stop working and isolating her from

ABRAHAM & GAUTAM, LLP | CIVIL RIGHTS BOUTIQUE

colleagues. This suspension came nearly five months after the initial allegations but just weeks after her protected complaint, suggesting retaliatory motive.

100.    During the investigation following her complaint, Apple intensified its scrutiny of Ms. Zhang, invaded her privacy by reviewing personal communications, and actively sought to manufacture grounds for termination rather than addressing her discrimination concerns.

101.    Apple used Ms. Zhang's request for help addressing reputational damage from her unexplained absence as a trap. When she declined to name colleagues who had contacted her after being told the question was irrelevant to the investigation, Apple later cited this as "non-cooperation" justifying termination – when in fact Ms. Zhang courageously protected her fellow colleagues against Apple's internal onslaught.

102.    On October 16, 2024, Apple terminated Ms. Zhang's employment, citing pretextual reasons including false accusations of "dishonesty" and "non-cooperation." The stated reasons were demonstrably false, as documentary evidence proves Ms. Zhang's statements were consistent throughout the investigation and she cooperated fully with all legitimate requests.

103.    The sequence of events—discrimination complaint on May 27, suspension on August 13, and termination on October 16—combined with the pretextual nature of the termination reasons, establishes that Ms. Zhang's protected activity was a substantial motivating factor in Apple's decision to terminate her employment.

104.    As a direct and proximate result of Apple's retaliation, Ms. Zhang suffered damages including lost wages and benefits from her $176,851 annual salary, future lost earnings, severe emotional distress, and damage to her professional reputation.

## SECOND CAUSE OF ACTION

### WHISTLEBLOWER RETALIATION

ABRAHAM & GAUTAM, LLP | CIVIL RIGHTS BOUTIQUE

(Cal. Labor Code § 1102.5)

105.  Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

106.  As set forth in the Legal Framework, California Labor Code § 1102.5 prohibits retaliation against employees who disclose information to persons with authority where the employee reasonably believes the information discloses a violation of law.

107.  Ms. Zhang engaged in protected whistleblowing activity when she reported to PBP Katrina Lim that the investigation was being conducted in violation of FEHA's anti-discrimination provisions and Apple's own policies. Ms. Zhang disclosed that investigator Kavanagh had made discriminatory statements suggesting Chinese employees are inherently corrupt, that the investigation was infected with bias, and that proper internal procedures were not being followed.

108.  Ms. Zhang also reported violations of Apple's investigation procedures, including the improper seizure of her electronic devices on May 23, 2024, when investigator Kavanagh threatened immediate escalation and potential termination if Ms. Zhang did not comply, then left early citing unrelated personal reasons and failed to provide promised documentation.

109.  Ms. Zhang had a reasonable belief that these practices violated state anti-discrimination laws, Apple's Business Conduct Policy prohibiting discrimination, and Apple's stated procedures for fair investigations. Her reports were made to someone with authority to investigate and address these violations.

110.  Ms. Zhang's protected disclosures were a contributing factor in Apple's decision to suspend her, intensify the investigation against her, manufacture false grounds for termination, and ultimately terminate her employment. The retaliatory actions began immediately after her protected disclosures and escalated over time.

ABRAHAM & GAUTAM, LLP | CIVIL RIGHTS BOUTIQUE

111.   Apple cannot prove by clear and convincing evidence that it would have taken the same actions absent Ms. Zhang's protected whistleblowing activity. The pretextual nature of the termination reasons, the temporal proximity between her complaints and adverse actions, and the absence of any legitimate grounds for termination demonstrate that but for her protected activity, she would not have been terminated.

112.   As a direct and proximate result of Apple's whistleblower retaliation, Ms. Zhang suffered damages including lost wages and benefits, future lost earnings, emotional distress, and damage to her professional reputation and career prospects.

## THIRD CAUSE OF ACTION

## NATIONAL ORIGIN DISCRIMINATION IN VIOLATION OF FEHA

### (Cal. Gov. Code § 12940(a))

113.   Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

114.   As set forth in the Legal Framework, FEHA prohibits discrimination based on national origin, including adverse employment actions based on stereotypes or assumptions about employees from particular countries or regions.

115.   Apple discriminated against Ms. Zhang based on her Chinese race and national origin and her association with Apple's Asia Pacific Office. This discrimination was evidenced most directly by investigator Cyndi Kavanagh's statement about APO staff.

116.   This statement revealed Apple's discriminatory belief that Chinese employees and those who worked in Apple's China office are inherently involved in or knowledgeable about corruption. This stereotype about Chinese employees being untrustworthy or corrupt is precisely the type of national origin discrimination FEHA prohibits.

117.   The discriminatory animus revealed in Ms. Kavanagh's statement infected the entire investigation. Rather than conducting an unbiased inquiry into Mr. Babbar's unsupported

allegations, the investigation proceeded from the discriminatory assumption that because Ms. Zhang was Chinese and had worked at APO, she must be guilty of something.

118.    Apple subjected Ms. Zhang to different terms and conditions of employment than similarly situated non-Chinese employees. Despite finding no evidence of wrongdoing after a six-month investigation, Apple terminated Ms. Zhang based on manufactured and pretextual reasons while the discriminatory stereotypes expressed by Ms. Kavanagh provided the real motive.

119.    The investigation itself constituted an adverse employment action, subjecting Ms. Zhang to months of discriminatory scrutiny, privacy invasions, and false accusations based not on any legitimate evidence but on stereotypes about her race and therefore national origin.

120.    Apple's termination of Ms. Zhang constituted discrimination based on national origin. A nearly ten-year employee with positive performance was fired following a biased investigation that began with and was guided by discriminatory assumptions about Chinese employees.

121.    As a direct and proximate result of Apple's discrimination, Ms. Zhang suffered damages including lost wages and benefits, future lost earnings, severe emotional distress from being stereotyped and discriminated against, and damage to her professional reputation.

**FOURTH CAUSE OF ACTION**

**HARASSMENT BASED ON NATIONAL ORIGIN IN VIOLATION OF FEHA**

(Cal. Gov. Code § 12940(j))

122.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

ABRAHAM & GAUTAM, LLP | CIVIL RIGHTS BOUTIQUE

123.    As set forth in the Legal Framework, FEHA prohibits harassment based on national origin, and a single incident can constitute harassment if sufficiently severe. Comments suggesting employees of certain national origins are inherently untrustworthy or criminal constitute prohibited harassment.

124.    Apple, through its agent and investigator Cyndi Kavanagh, subjected Ms. Zhang to severe harassment based on her national origin when Ms. Kavanagh suggested that Chinese employees are inherently corrupt or criminal.

125.    This statement was sufficiently severe to constitute harassment as it suggested Ms. Zhang was involved in criminal conduct solely because of her Chinese national origin and association with APO. A reasonable person in Ms. Zhang's position would find this accusation based on national origin stereotypes to be severely humiliating and offensive.

126.    The harassment was not limited to this single statement but continued throughout the investigation, which proceeded from the discriminatory premise that Ms. Zhang must be guilty of something because of her background. The months-long investigation based on national origin stereotypes created a hostile work environment.

127.    Ms. Kavanagh made this statement in her capacity as lead investigator with authority over the investigation that would determine Ms. Zhang's continued employment. Apple is liable for this harassment as it was perpetrated by someone with authority over Ms. Zhang acting within the scope of that authority.

128.    The harassment altered the terms and conditions of Ms. Zhang's employment, subjecting her to a hostile work environment based on her national origin, ultimately resulting in her termination.

129.    As a direct and proximate result of Apple's harassment, Ms. Zhang suffered damages including severe emotional distress, humiliation, anxiety, damage to her professional reputation, and ultimately the loss of her employment.

ABRAHAM & GAUTAM, LLP | CIVIL RIGHTS BOUTIQUE

**FIFTH CAUSE OF ACTION**

**INVASION OF PRIVACY IN VIOLATION OF CALIFORNIA CONSTITUTION**

(Cal. Const. Art. I, § 1)

130.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

131.    As set forth in the Legal Framework, the California Constitution guarantees an inalienable right to privacy that extends to private sector employees and covers personal communications. Employers must demonstrate a compelling interest and narrow tailoring for any privacy intrusion.  California's privacy protections in its Constitution are not hortatory phraseology but a private right of action.

132.    Ms. Zhang maintained a reasonable expectation of privacy in her personal WeChat communications with family and friends. These were private messages on personal accounts used for purely personal purposes, including intimate conversations with her husband and casual exchanges with friends.

133.    Without Ms. Zhang's knowledge or consent, Apple accessed and reviewed these private communications, including conversations about personal matters entirely unrelated to her employment or Apple's business. Apple reviewed jokes between friends, discussions about her husband's travel, and casual gossip—all clearly personal in nature.

134.    Apple had no compelling interest justifying this invasion of privacy. After months of investigation, no evidence of wrongdoing had been found. The privacy invasion was not narrowly tailored to any legitimate business purpose but rather constituted a fishing expedition through Ms. Zhang's personal life.

135.    Apple's conduct was particularly egregious as it used these private communications—taken out of context and mischaracterized—as purported evidence to

ABRAHAM & GAUTAM, LLP | CIVIL RIGHTS BOUTIQUE

justify termination. Apple transformed innocent personal conversations into alleged evidence of professional misconduct.

136.    The constitutional violation was willful and in conscious disregard of Ms. Zhang's fundamental right to privacy. Apple knew or should have known that accessing personal communications without consent violated California's strong privacy protections.

137.    As a direct and proximate result of Apple's invasion of privacy, Ms. Zhang suffered damages including severe emotional distress from the violation of her intimate communications, anxiety about the exposure of private conversations, humiliation, and ultimately the loss of her employment based on mischaracterized personal messages.

### SIXTH CAUSE OF ACTION

**COMMON LAW INVASION OF PRIVACY – INTRUSION UPON SECLUSION**

(CACI No. 1800)

138.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

139.    As set forth in the Legal Framework, California recognizes invasion of privacy by intrusion upon seclusion when one intentionally intrudes into private matters in a way highly offensive to a reasonable person.

140.    Apple intentionally intruded into Ms. Zhang's private affairs by accessing and reviewing her personal WeChat messages without authorization. These included intimate conversations with her husband, personal exchanges with friends, and private discussions about non-work matters.

141.    Ms. Zhang had a reasonable expectation of privacy in these personal communications. The messages were on personal accounts, involved personal relationships, and contained private information she never intended to share with her employer.

142. Apple's intrusion would be highly offensive to any reasonable person. The company reviewed private spousal communications, analyzed personal jokes between friends, and scrutinized casual conversations for any material that could be twisted against Ms. Zhang. This level of intrusion into personal life exceeds all reasonable bounds.

143. The intrusion was done intentionally and deliberately as part of Apple's effort to find any basis to terminate Ms. Zhang after failing to find legitimate grounds through proper investigation channels.

144. Apple's intrusion was particularly offensive because it used these private communications in bad faith, mischaracterizing innocent personal conversations as evidence of professional wrongdoing and using them as a pretext for termination.

145. Apple's intrusion into Ms. Zhang's private communications exemplifies the exact employer overreach California law condemns—a powerful corporation exploiting its resources to violate the sacred boundary between work and personal life, transforming innocent family conversations into weapons of retaliation, and demonstrating that no aspect of an employee's humanity is safe from Apple's discriminatory reach.

146. As a direct and proximate result of Apple's intrusion upon her seclusion, Ms. Zhang suffered damages including severe emotional distress, loss of privacy, humiliation from the exposure of intimate communications, and economic losses from her termination.

## SEVENTH CAUSE OF ACTION

### WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

(CACI No. 2430)

147. Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

148. As set forth in the Legal Framework, California recognizes wrongful termination in violation of public policy when an employee is terminated for exercising statutory rights

ABRAHAM & GAUTAM, LLP | CIVIL RIGHTS BOUTIQUE

ABRAHAM & GAUTAM, LLP | CIVIL RIGHTS BOUTIQUE

or reporting statutory violations. FEHA's prohibitions against discrimination and retaliation constitute fundamental public policies.

149.    Apple wrongfully terminated Ms. Zhang in violation of California's fundamental public policies prohibiting national origin discrimination (Cal. Gov. Code § 12940(a)), prohibiting retaliation for opposing discrimination (Cal. Gov. Code § 12940(h)), protecting whistleblowers who report violations of law (Cal. Lab. Code § 1102.5), and protecting privacy rights (Cal. Const. Art. I, § 1).

150.    Ms. Zhang was terminated for exercising her statutory rights to oppose national origin discrimination and to report violations of anti-discrimination laws. Her protected activities in complaining about discrimination were a substantial motivating factor in Apple's termination decision.

151.    Ms. Zhang was also terminated based on Apple's discriminatory animus toward her Chinese national origin and association with APO, in direct violation of FEHA's fundamental public policy against workplace discrimination.

152.    Additionally, Ms. Zhang's termination violated public policy by punishing her for asserting her constitutional right to privacy when she questioned the propriety of Apple's intrusion into her personal communications.

153.    There is a clear nexus between Ms. Zhang's protected conduct—opposing discrimination, reporting legal violations, and asserting privacy rights—and her termination. The temporal proximity, pretextual reasons, and discriminatory statements establish this causal connection.

154.    As a direct and proximate result of her wrongful termination in violation of public policy, Ms. Zhang suffered damages including lost wages and benefits, future lost earnings, emotional distress, and damage to her professional reputation and career prospects.

**EIGHTH CAUSE OF ACTION**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

(CACI No. 1600)

155.   Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

156.   As set forth in the Legal Framework, intentional infliction of emotional distress requires extreme and outrageous conduct that exceeds all bounds of decency tolerated in civilized society. Conduct targeting employees based on protected characteristics combined with other wrongful acts can constitute such extreme behavior.

157.   Under California law, intentional infliction of emotional distress ("IIED") is a distinct intentional tort, not merely a gap-filler or negligence claim as rumor would have it. The tort exists precisely because California recognizes that some conduct is so outrageous—so beyond the pale of civilized society—that it demands its own remedy.

158.   Here, Apple's conduct meets this exacting standard: weaponizing racial stereotypes against a Chinese employee, mining her private conversations with her husband for ammunition, using her request for help as a trap, and orchestrating her destruction after nearly a decade of exemplary service. This deliberate campaign of cruelty is precisely what IIED was designed to address.

159.   Apple engaged in extreme and outrageous conduct by orchestrating a campaign of discrimination, retaliation, and privacy invasion against Ms. Zhang. This conduct included accusing her of corruption based solely on her Chinese national origin, conducting a months-long sham investigation designed to force her out, invading her privacy by reviewing intimate personal communications, manufacturing false accusations of dishonesty and non-cooperation, and terminating a nearly ten-year employee based on discriminatory stereotypes and pretextual reasons.

ABRAHAM & GAUTAM, LLP | CIVIL RIGHTS BOUTIQUE

160.    The discriminatory investigation, retaliatory suspension, and pretextual termination of Ms. Zhang were authorized, ratified, or conducted by Apple's managing agents, including but not limited to Sid Babbar, Jayang Patel, and senior HR management including for example Mike Gillaspie.

161.    These managing agents had authority to make or substantially influence employment decisions, set company policy, and exercise substantial independent authority and judgment in their corporate decision-making. Mr. Babbar initiated the discriminatory investigation despite having no evidence. Mr. Patel reviewed and approved the pretextual termination. Human resources management, including Mr. Gillaspie, ratified the discrimination by defending the false reasons for termination.

162.    Additionally, Apple's senior management was aware of and ratified the discriminatory conduct through their failure to remedy the discrimination after Ms. Zhang's complaints to Katrina Lim on May 27, 2024. Despite being on notice of the discriminatory "APO" statement and biased investigation, Apple's managing agents permitted the investigation to continue under the same biased investigator and escalated retaliation against Ms. Zhang.

163.    Apple acted with malice, oppression, and fraud through its managing agents who knew the investigation was discriminatory, knew the termination reasons were false, and acted with conscious disregard of Ms. Zhang's rights. The conduct was despicable and was done with a willful and conscious disregard of the rights of Ms. Zhang.

164.    Apple's conduct was particularly outrageous in its use of Ms. Zhang's request for help with reputational damage as a trap. When she sought assistance dealing with rumors caused by her unexplained absence, Apple used this vulnerability to manufacture claims of "non-cooperation" to justify termination.

ABRAHAM & GAUTAM, LLP | CIVIL RIGHTS BOUTIQUE

165.    Apple acted with intent to cause emotional distress or with reckless disregard of the probability of causing such distress. The deliberate nature of the discrimination, calculated privacy invasions, and manufactured grounds for termination demonstrate Apple knew its conduct would cause severe emotional harm.

166.    No reasonable person should be expected to endure months of discriminatory investigation based on racial stereotypes, invasion of intimate privacy, false accusations attacking their integrity, and pretextual termination after nearly a decade of service.

167.    As a direct result of Apple's conduct, Ms. Zhang suffered severe emotional distress manifested in insomnia, anxiety and inability to function normally in daily life. The severity of her distress is evidenced by her inability to sleep after the investigation escalated and her ongoing psychological trauma from the discriminatory treatment.

168.    As a direct and proximate result of Apple's intentional infliction of emotional distress, Ms. Zhang suffered damages including severe emotional distress, psychological harm, physical manifestations of stress, and ongoing mental anguish.

## NINTH CAUSE OF ACTION

### DEFAMATION

(Cal. Civil Code § 44 et. sq.)

169.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

170.    As set forth in the Legal Framework, false accusations of dishonesty or unethical conduct in the workplace constitute defamation *per se* as they directly affect professional reputation. Any qualified privilege for employment communications is lost when statements are made with malice.

171.    Apple published false and defamatory statements about Ms. Zhang to third parties, including statements in her termination letter and personnel file that she engaged in "conduct that warrants termination" and violated Apple's Business Conduct Policy.

172.    In California, publication for defamation purposes does not require dissemination outside the company. If a defamatory statement in an HR file is communicated to or accessed by someone other than the subject—such as another HR employee or supervisor—that is sufficient.

173.    Apple made specific false accusations that Ms. Zhang was "dishonest" during the investigation, claiming she initially denied speaking with Mr. Babbar and then admitted it, and that she claimed and then denied knowledge of supply chain violations.

174.    These statements were demonstrably false, as documentary evidence proves Ms. Zhang never denied speaking with Mr. Babbar and consistently maintained she had no knowledge of wrongdoing.

175.    Apple also falsely accused Ms. Zhang of "non-cooperation" based on her declining to answer questions the investigator admitted were irrelevant. This accusation was false and made in bad faith.

176.    These false statements were published to third parties including human resources personnel, management, and others who would have access to her personnel file and termination records. The statements directly injured Ms. Zhang in her profession by falsely portraying her as dishonest and unethical.

177.    Apple made these defamatory statements with malice, knowing they were false or with reckless disregard for their truth. Apple had access to documentary evidence proving Ms. Zhang's statements were consistent and that she had cooperated with all legitimate requests.

ABRAHAM & GAUTAM, LLP | CIVIL RIGHTS BOUTIQUE

178.    The defamatory statements are defamatory *per se* as they accuse Ms. Zhang of

dishonesty and unethical conduct in her profession, directly affecting her ability to

obtain future employment and damaging her professional reputation.

179.    As a direct and proximate result of Apple's defamation, Ms. Zhang suffered damages

including injury to her professional reputation, diminished career prospects, inability to

obtain comparable employment, emotional distress, and economic losses.

## TENTH CAUSE OF ACTION

## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

### (CACI No. 2423)

180.    Plaintiff realleges and incorporates by reference each and every allegation contained

in the preceding paragraphs as though fully set forth herein.

181.    As set forth in the Legal Framework, every employment contract contains an implied

covenant of good faith and fair dealing. Conducting a sham investigation to manufacture

grounds for termination, particularly following protected activity, breaches this

covenant.

182.    After nearly ten years of exemplary service and consistently positive performance,

Ms. Zhang had a legitimate expectation that any investigation would be conducted fairly,

without bias, in good faith, and in accordance with Apple's stated policies of non-

discrimination and ethical conduct.

183.    Apple breached the implied covenant through a pattern of bad faith conduct

including initiating an investigation based on discriminatory stereotypes rather than

evidence, conducting the investigation with predetermined conclusions based on Ms.

Zhang's national origin, violating her privacy to search for pretextual termination

grounds, ignoring her complaints about discrimination and procedural violations,

manufacturing false accusations of dishonesty and non-cooperation, and terminating her

ABRAHAM & GAUTAM, LLP | CIVIL RIGHTS BOUTIQUE

employment using demonstrably false reasons while the true motive was discrimination and retaliation.

184.    Apple's breach was particularly egregious because it weaponized its own investigation process against Ms. Zhang after she complained about discrimination, using the investigation as a tool of retaliation rather than a legitimate inquiry into facts.

185.    The sham nature of the investigation is evidenced by its failure to find any actual wrongdoing despite six months of intensive scrutiny, its reliance on twisted interpretations of innocent personal communications, and its use of Ms. Zhang's own requests for help as evidence against her.

186.    Apple's bad faith is further demonstrated by its violation of its own policies, including the Business Conduct Policy's promises of non-discrimination and the Global Whistleblowing Policy's guarantees against retaliation.

187.    As a direct and proximate result of Apple's breach of the implied covenant, Ms. Zhang suffered damages including lost wages and benefits, future lost earnings, severe emotional distress from the bad faith nature of her treatment, and damage to her professional reputation.

## ELEVENTH CAUSE OF ACTION

### FAILURE TO PRODUCE PERSONNEL AND PAYROLL RECORDS

(Cal. Labor Code §§ 226, 432, 1198.5)

188.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

189.    California Labor Code § 1198.5 provides current and former employees the right to inspect and receive copies of their personnel files. The statute requires employers to make files available within a reasonable time, but no later than 30 calendar days from receipt of a written request.

190.   California Labor Code § 226(c) requires employers who receive a written or oral request from a former employee to inspect or copy payroll records to comply with the request as soon as possible but no later than 21 calendar days from the date of the request.

191.   California Labor Code § 432 further requires employers to furnish copies of all employment records bearing the employee's signature upon request.

192.   On January 22, 2025, Ms. Zhang's counsel sent Apple a formal written demand for her complete personnel file and payroll records pursuant to Labor Code §§ 226, 432, and 1198.5. This demand letter was sent via USPS and email to Apple's headquarters at One Apple Park Way, Cupertino, California.

193.   On January 24, 2025, Apple's representative Joe Miguez III confirmed receipt of this demand via email, thereby establishing Apple's actual knowledge of Ms. Zhang's statutory request. Despite this confirmed receipt, and significant back and forth via email and phone with Mr. Miguez III, Apple has failed and refused to produce any of the requested records to date.

194.   The demand letter specifically requested all personnel files, payroll records, time records, performance evaluations, investigation documents, email accounts, and other employment-related documentation. The letter clearly stated the statutory deadlines: 21 days for payroll records and 30 days for personnel files.

195.   Despite the clear statutory requirements, Apple has completely failed and refused to produce any of the requested records. The deadline for producing payroll records expired on February 12, 2025, and the deadline for producing personnel files expired on February 21, 2025.

196.   Ms. Zhang's counsel has engaged in repeated communications with Apple's representative, Joe Miguez III, nearly every month following the statutory deadlines.

ABRAHAM & GAUTAM, LLP | CIVIL RIGHTS BOUTIQUE

Specifically on March 11, 2025, Ms. Zhang' counsel specifically notified Mr. Miguez of Apple's statutory duties. Despite these repeated efforts, Apple has steadfastly refused to comply with its legal obligations to produce the requested records.

197.    Apple's failure to produce these records is particularly egregious given that these documents likely contain evidence supporting Ms. Zhang's discrimination and retaliation claims, including documentation of the biased investigation, her positive performance history, and records that would disprove Apple's pretextual termination reasons.

198.    Labor Code § 226(f) entitles a former employee to recover a $750 penalty from an employer who fails to permit inspection or copying of payroll records within the statutory timeframe. Labor Code § 1198.5(k) similarly provides for a $750 penalty for failure to provide personnel records within the required timeframe.

199.    Apple's willful refusal to comply with these statutory requirements demonstrates bad faith and a deliberate attempt to obstruct Ms. Zhang's ability to pursue her legal rights. This conduct is part of Apple's pattern of retaliation against Ms. Zhang for opposing discrimination.

200.    As a direct result of Apple's violations, Ms. Zhang has been damaged by the inability to access her employment records, which has hindered her ability to fully document her claims and seek comparable employment.

201.    Ms. Zhang is entitled to statutory penalties of at least $1,500 ($750 for personnel records and $750 for payroll records), plus any additional penalties and remedies available under law.

## TWELFTH CAUSE OF ACTION

### RETALIATION IN VIOLATION OF LABOR CODE

(Cal. Labor Code § 98.6)

ABRAHAM & GAUTAM, LLP | CIVIL RIGHTS BOUTIQUE

ABRAHAM & GAUTAM, LLP | CIVIL RIGHTS BOUTIQUE

202.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

203.    California Labor Code § 98.6 prohibits employers from discharging or in any manner discriminating, retaliating, or taking adverse action against any employee because the employee has engaged in conduct protected under the Labor Code, including filing complaints, exercising rights under the Labor Code, or engaging in lawful conduct occurring during nonworking hours away from the employer's premises.

204.    Ms. Zhang engaged in multiple activities protected under Labor Code § 98.6, including but not limited to: exercising her rights under the Labor Code to be free from discrimination and retaliation; filing internal complaints regarding violations of California Labor Code provisions incorporated through FEHA; engaging in lawful private communications with family and friends during nonworking hours; and requesting her personnel and payroll records pursuant to Labor Code §§ 226, 432, and 1198.5.

205.    Ms. Zhang's private WeChat conversations with family and friends constituted lawful conduct occurring during nonworking hours away from Apple's premises. These personal communications were protected activity that could not form the basis for any adverse employment action.

206.    Following Ms. Zhang's protected activities, Apple retaliated by suspending her employment on August 13, 2024, conducting an intensified discriminatory investigation designed to manufacture grounds for termination, and ultimately terminating her employment on October 16, 2024.

207.    Apple's stated reasons for these adverse actions were pretextual. The real reason was retaliation for Ms. Zhang's protected activities under the Labor Code, including her

ABRAHAM & GAUTAM, LLP | CIVIL RIGHTS BOUTIQUE

complaints about discrimination and her lawful personal communications that Apple improperly accessed and mischaracterized.

208.    Even after Ms. Zhang's termination, Apple's retaliation continued through its willful refusal to provide her personnel and payroll records as required by Labor Code §§ 226 and 1198.5, despite repeated requests from her counsel beginning January 22, 2025. This ongoing retaliation further demonstrates Apple's pattern of punishing Ms. Zhang for exercising her rights under the Labor Code.

209.    As a direct and proximate result of Apple's violations of Labor Code § 98.6, Ms. Zhang suffered lost wages and work benefits, emotional distress, damage to her professional reputation, and continues to suffer harm from Apple's refusal to provide her employment records.

210.    Pursuant to Labor Code § 98.6(b), Ms. Zhang is entitled to reimbursement for lost wages and work benefits, injunctive relief (should it be so desired), reasonable attorney's fees and costs, and any other relief the Court deems appropriate.

## THIRTEENTH CAUSE OF ACTION

### UNFAIR COMPETITION

(Cal. Bus. and Prof. Code § 17200)

211.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

212.    California Business and Professions Code § 17200 prohibits any unlawful, unfair, or fraudulent business act or practice. Apple engaged in business acts and practices that violated all three prongs of the Unfair Competition Law, or "UCL."

213.    Apple engaged in unlawful business practices by violating numerous California statutes and constitutional provisions, including but not limited to as noted *supra*: violating FEHA's prohibitions against national origin discrimination (Cal. Gov. Code §

12940(a)); violating FEHA's prohibitions against retaliation (Cal. Gov. Code §

12940(h)); violating FEHA's prohibitions against harassment (Cal. Gov. Code §

12940(j)); violating the whistleblower protections of Labor Code § 1102.5; violating the

retaliation prohibitions of Labor Code § 98.6; violating Ms. Zhang's constitutional right

to privacy (Cal. Const. Art. I, § 1); and violating Labor Code §§ 226, 432, and 1198.5 by

refusing to provide personnel and payroll records.

214.    Each of these statutory and constitutional violations constitutes an independent

unlawful business practice under the UCL. Apple's pattern of violations demonstrates a

systematic unlawful business practice of discriminating against and retaliating against

employees based on national origin.

215.    Apple engaged in unfair business practices that offend established public policy and

are immoral, unethical, oppressive, and substantially injurious to employees.

216.    These unfair practices include: conducting a discriminatory investigation based on

stereotypes about Chinese employees; weaponizing its Business Conduct investigation

process to retaliate against an employee who complained about discrimination; invading

an employee's private communications without legitimate business justification;

manufacturing false reasons to terminate a nearly ten-year employee with exemplary

performance; and continuing to retaliate post-termination by refusing to provide

statutorily required employment records.

217.    Apple's conduct violates the established public policy against workplace

discrimination and retaliation. The conduct is particularly oppressive because Apple

used its vastly superior financial and human resources and position of power to destroy

the career of an employee who dared to complain about discrimination.

218.    Apple engaged in fraudulent business practices likely to deceive members of the

public, including current and prospective employees. Apple publicly represents that it

values diversity, prohibits discrimination, protects whistleblowers, and conducts fair investigations. Apple's Business Conduct Policy promises employees they will be treated with "respect and courtesy" and that the company "does not tolerate discrimination."

219.    These representations were fraudulent and deceptive because Apple actually engaged in discrimination based on national origin stereotypes, retaliated against employees who report discrimination, conducted sham investigations designed to force out complaining employees, and violated its own stated policies.

220.    Employees and job applicants in California are likely to be deceived by Apple's public representations about its workplace culture and policies.

221.    Apple's unfair competition has caused Ms. Zhang to lose money and property, including lost wages, lost benefits, and the value of her employment. Ms. Zhang has also been deprived of her statutory right to access her personnel and payroll records, which have monetary value for pursuing legal remedies and future employment.

222.    Ms. Zhang lacks an adequate remedy at law for Apple's ongoing refusal to provide her employment records and its maintenance of false and defamatory information in her personnel file. Apple has made a business determination to violate the law due to its highly superior financial position. Injunctive relief is necessary to compel Apple to provide the requested records and to cease its unlawful, unfair, and fraudulent business practices.

223.    Pursuant to Business and Professions Code § 17203, Ms. Zhang is entitled to restitution of all wages and benefits lost due to Apple's unfair competition, injunctive relief compelling Apple to provide her employment records, injunctive relief requiring Apple to expunge false and defamatory statements from her personnel file, and any other relief the Court deems appropriate to prevent Apple from continuing its unlawful, unfair, and fraudulent business practices.

ABRAHAM & GAUTAM, LLP | CIVIL RIGHTS BOUTIQUE

**PRAYER FOR RELIEF**

224.   WHEREFORE, Plaintiff Siran Zhang respectfully requests that this Court enter judgment in her favor and against Defendant Apple Inc. as follows:

225.   For economic damages according to proof, including but not limited to past and future lost wages, benefits, and other compensation;

226.   For reimbursement of lost wages and injunctive relief pursuant to Labor Code § 98.6;

227.   For compensatory damages for emotional distress, humiliation, and mental anguish;

228.   For punitive damages pursuant to California Civil Code § 3294 based on Apple's malicious, fraudulent, and oppressive conduct committed, authorized, and ratified by its managing agents who acted with conscious disregard of Plaintiff's rights;

229.   For prejudgment and post-judgment interest at the maximum legal rate;

230.   For reasonable attorneys' fees and costs pursuant to California Government Code § 12965(b), California Labor Code § 1102.5(f), and other applicable statutes;

231.   For statutory penalties pursuant to California Labor Code §§ 226(f) and 1198.5(k) for failure to produce personnel and payroll records;

232.   For restitution and injunctive relief pursuant to Business and Professions Code § 17200;

233.   For an order requiring Apple to expunge all false and defamatory statements from Plaintiff's personnel file;

234.   For an order compelling Apple's immediate production of all personnel and payroll records required under California Labor Code §§ 226, 432, and 1198.5 prior to the Rule 26(f) conference, as these records are essential for Plaintiff to properly frame discovery and evaluate potential amendment of claims;

235.   For such other and further relief as the Court deems just and proper.

ABRAHAM & GAUTAM, LLP | CIVIL RIGHTS BOUTIQUE

Respectfully submitted,

Dated: June 7, 2025

*Gautam Jagannath*

Emily Abraham, Esq.
Gautam Jagannath, Esq.
**ABRAHAM & GAUTAM, LLP**
*Counsel for PLAINTIFF*
1400 Shattuck Avenue, Ste 12-160
Berkeley, CA 94709

## JURY DEMAND

PLAINTIFF hereby demand a jury trial on all claims for relief alleged in, and on all issues so triable and raised by this Complaint.

Respectfully submitted,

Dated: June 7, 2025

*Gautam Jagannath*

Emily Abraham, Esq.
Gautam Jagannath, Esq.
**ABRAHAM & GAUTAM, LLP**
*Counsel for PLAINTIFF*

ABRAHAM & GAUTAM, LLP | CIVIL RIGHTS BOUTIQUE